Argued and submitted March 10, affirmed April 16, 1997

Daniel LOURIM,
*Appellant,*

*v.*

John SWENSEN,
*Defendant,*

*and*

CASCADE PACIFIC COUNCIL,
Boy Scouts of America,
an Oregon non-profit corporation;
and The Boy Scouts of America,
a congressionally chartered corporation,
authorized to do business in Oregon,
*Respondents.*

(C95-1000CV; CA A92903)

936 P2d 1011

Kelly Clark argued the cause and filed the briefs for appellant.

Thomas Christ argued the cause for respondents. With him on the brief were Charles T. Smith, Candace H. Weatherby and Mitchell, Lang & Smith.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

## LANDAU, J.

This is an action for damages arising out of allegations that plaintiff's former Boy Scout leader sexually assaulted him when plaintiff was a child, approximately 30 years ago. In 1995, plaintiff sued the Scout leader, John Swensen, as well as the Cascade Pacific Council and the Boy Scouts of America, collectively referred to as the "Boy Scouts." Against Swensen, plaintiff alleged claims of sexual assault and battery. Against the Boy Scouts, he asserted liability on the basis of *respondeat superior* and negligent retention, training and supervision of Swensen. The Boy Scouts moved for dismissal of both the *respondeat superior* and negligence claims, arguing that plaintiff's claims were untimely filed and that, in any event, he failed to state a claim. Plaintiff argued that the claims were timely under ORS 12.117, which provides an extended limitation period for "actions based on conduct that constitutes child abuse" and actions for "knowingly allowing, permitting or encouraging child abuse." The trial court held that the extended limitation period described in ORS 12.117 applies only to claims of intentional child abuse, and, because there is no allegation that the Boy Scouts intentionally abused plaintiff, entered judgment under ORCP 67 B dismissing his claims as untimely. Plaintiff appeals, arguing that the trial court erred in concluding that the claims are not subject to ORS 12.117. The Boy Scouts contend that the trial court correctly concluded that the statute does not apply. In the alternative, they contend that dismissal of the *respondeat superior* claim is warranted, because plaintiff failed to state a claim.

As to the *respondeat superior* claim, we do not address whether the claim was timely filed, because the Boy Scouts are correct in asserting that plaintiff failed to state a claim because, as a matter of law, the alleged sexual assault did not occur within the scope of Swensen's employment with the Boy Scouts. As to the negligence claim, we conclude that ORS 12.117 is not limited to claims for intentional misconduct but applies more broadly to claims of negligence for "knowingly allowing, permitting or encouraging child abuse"; nevertheless, because plaintiff's complaint lacks allegations that the Boy Scouts knew of Swensen's abuse of plaintiff and

allowed, permitted or encouraged the abuse to occur, the trial court did not err in dismissing the negligence claim.

■ In reviewing the dismissal of a complaint, we look only to the pleadings, assume that all alleged facts are true and draw all necessary inferences in favor of the plaintiff. *Allen v. Lawrence*, 137 Or App 181, 186, 903 P2d 919 (1995), *rev den* 322 Or 644 (1996); *Dauven v. St. Vincent Hospital*, 130 Or App 584, 586, 883 P2d 241 (1994). On September 7, 1995, plaintiff filed his complaint. It was amended subsequently and, as relevant, contains the following allegations:

"4.

"At all relevant times, Swensen was a volunteer Boy Scout leader, duly authorized by the Boy Scouts and the Cascade Pacific Council to act in that capacity, and at all times was acting in the course and scope of his duties.

"* * * * *

"5.

"From 1965 through 1967, while Lourim was a minor, on at least thirty occasions Swensen sexually assaulted Lourim by exposing himself to Lourim, fondling Lourim, having Lourim fondle him, and exposing Lourim to pornography and displays of live sexual activity by Lourim and other boys (hereinafter the 'Assaults').

"6.

"On or about April, 1994, Lourim discovered the causal connection between the Assaults and the damages he suffered as a result of the Assaults * * *.

"* * * * *

"10.

"As part of his volunteer duties with the Boy Scouts and the Cascade Pacific Council, Swensen was directed to fulfill the role of troop leader or assistant troop leader to Lourim's troop.

"11.

"Swensen improperly performed his duties as troop leader for the Boy Scouts and the Cascade Pacific Council,

by using and manipulating his fiduciary position, respect and authority as troop leader, in order to:

"A.)   Befriend Lourim;

"B.)   Befriend Lourim's family;

"C.)   Gain the trust and confidence of Lourim's family as a suitable friend, guide, mentor, and role model to Lourim;

"D.)   Become a frequent social guest in the Lourim family home;

"E.)   Gain the support, acquiescence and permission of Lourim's family for Lourim to spend substantial periods of time alone with Swensen and with Swensen and other boys;

"F.)   Become Lourim's friend, guide[,] mentor and role model;

"G.)   Gain opportunity to socialize with Lourim and to spend time alone with Lourim in remote places, and to spend time alone [with] Lourim and other boys in remote places;

"H.)   Gain opportunity to physically touch Lourim;

"I.)   Gain opportunity to commit the Assaults. (The above performance of duties as troop leader, including the Assaults, are hereinafter collectively referred to as the 'Manipulations').

"12.

"The Manipulations were committed in connection with Swensen's duties as troop leader, were committed within the time and space limits of his responsibilities as troop leader, were committed out of a desire, at least initially and partially, to fulfill his duties as troop leader, and were generally actions of a kind and nature which Swensen was required to perform as troop leader.

"* * * * *

"14.

"The Boy Scouts and the Cascade Pacific Council carried a duty to Lourim, as a minor boy being served by the mission of the Boy Scouts and the Cascade Pacific Council, to exercise reasonable care in the selection, training,

assignment, supervision and retention of its volunteer troop leaders, including Swensen, lest minor boys such as Lourim, be sexually molested, abused, and assaulted by troop leaders, including Swensen.

"15.

"The Boy Scouts and the Cascade Pacific Council breached their duty to Lourim, creating an unreasonable risk of foreseeable harm to Lourim, and were negligent in one or more of the following particulars:

"A. In failing to devise, implement and execute an effective process for screening of potential Boy Scout leaders, including Swensen, before selection in order to reject individuals who were not good candidates and might accordingly be an unreasonable risk to engage in inappropriate sexual conduct, including pedophilia.

"B. In failing[ ] to devise, implement and execute an effective process of periodic or random screening of existing Boy Scout leaders, including Swensen, and removal of individuals, including Swensen, who were unfit or who were violating their duties as volunteer troop leaders.

"16.

"As a result of the negligence of the Boy Scouts and the Cascade Pacific Council, Lourim was the victim of the Manipulations and Assaults and suffered the injuries set out in paragraph 6 above.

"* * * * *

"18.

"The negligence of the Boy Scouts and the Cascade Pacific Council as set out in paragraph 14 above constitutes 'conduct knowingly allowing or permitting child abuse' within the meaning of ORS 12.117, and this action is therefore timely under the allegations in paragraph 5 above."

■ We first examine plaintiff's contention that the trial court erred in dismissing his claim that the Boy Scouts are liable on a theory of *respondeat superior*. According to plaintiff, ORS 12.117 affords an extended period of limitation for "actions based on conduct that constitutes child abuse," and

that this is such an action, for vicarious liability based on Swensen's acts of abuse. The Boy Scouts respond that "actions based on conduct that constitutes child abuse" refers only to claims against the individual who intentionally committed the abuse. Alternatively, the Boy Scouts argue that the trial court appropriately dismissed the claim, because the allegations are inadequate to state a claim for vicarious liability. According to the Boy Scouts, vicarious liability is predicated on the tortious conduct of an employee committed in the scope of employment, and sexual assault is not within a troop leader's employment, as a matter of law.[1] Plaintiff responds that the question whether an employee's tortious conduct occurred in the scope of employment is a jury question and therefore his complaint cannot be dismissed on the ground that he failed to state a claim. Because we conclude that the Boy Scouts' alternative argument is dispositive, we do not determine whether, in these or other circumstances, ORS 12.117 may apply to a *respondeat superior* claim.

■ *Respondeat superior*—literally, "let the superior reply"—is a legal theory by which an employer is held liable for the tortious conduct of an employee committed in the scope of employment.[2] The employer's liability turns on the ascertainment of whether the employee's act was committed "in the scope of employment." That term, however, varies in

[1] The Boy Scouts do not assert that its volunteer workers are not employees, and we do not address whether the theory of vicarious liability is inapplicable to the Boy Scouts on that ground. *See, e.g., Mauch v. Kissling*, 56 Wash App 312, 318-19, 783 P2d 601, 606 (1989) (Boy Scouts are not vicariously liable for tortious acts of volunteer scoutmaster in the absence of evidence that the Boy Scouts had the right to control the volunteer's activities); *McGarr v. Boy Scouts of America*, 74 Md App 127, 141-42, 536 A2d 728, 735, *cert den* 313 Md 7, 542 A2d 844 (1988) (same).

[2] Strictly speaking, it is not actually a theory in the sense of an analytical basis for decision making; it is instead a Latin term used to express a legal conclusion. As Harold Laski once complained about the subject:

"*Respondeat superior* is an argument which, like David, has slain its tens of thousands. Its seeming simplicity conceals in fact a veritable hornet's nest of stinging difficulties. It is the merest dogma, and in no sense explanation. For while everyone can see that the master ought to answer for acts he has authorized, why should he be liable either where no authorization can be shown, or where express prohibition of an act exists? Latin may bring us comfort but it will not solve our problems."

Harold J. Laski, *The Basis of Vicarious Liability*, 26 Yale LJ 105, 106-07 (1916). The old complaint still rings true today.

meaning according to the underlying policies that the courts conclude provide the foundation for the rule.[3] Historically, the rule has roots in the law of agency and implied authority, but its more recent applications extend beyond such considerations to a more explicitly policy-oriented matter of fairness and risk allocation. Prosser and Keeton explain it in the following terms:

> "It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment."

*Prosser and Keeton on Torts* § 70 at 502 (5th ed 1984). The comments to the *Restatement (Second) of Agency* similarly explains:

> "[T]he ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed."

*Restatement (Second) of Agency* § 229, Comment a (1958).

The Oregon Supreme Court, expressly following the rationale described both by Prosser and Keeton and by the *Restatement*, has articulated several factors that must be considered in determining whether the loss in a particular case that results from an act of an employee is the sort of loss that fairly should be considered a risk of the employer's business. In *Stanfield v. Laccoarce*, 284 Or 651, 655, 588 P2d 1271 (1978), the court explained:

> "In deciding whether an employee was acting within the scope of his employment, the factors to be considered are whether the act in question is of a kind the employee was hired to perform, whether the act occurred substantially

---

[3] *See, e.g.*, Stuart M. Speiser, Charles F. Krause and Alfred W. Gans, *1 The American Law of Torts* § 4.17 at 632-33 (1983) ("In the area of vicarious liability, nothing is more important, and nothing is more difficult to define with any scientific or mathematical precision, than the constantly recurring term, 'scope of employment.'"); *Prosser and Keeton on Torts* § 70 at 502 (5th ed 1984) ("This highly indefinite phrase, which sometimes is varied with 'in the course of the employment,' is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility in decisions.").

within the authorized limits of time and space, and whether the employee was motivated, at least in part, by a purpose to serve the employer."

In *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988), the court repeated the three factors, but then characterized them as "requirements," which "must be met to conclude that an employee was acting within the scope of employment."

■ As a rule, whether an employee committed a tortious act in the scope of employment is regarded as a jury question. *Stanfield*, 284 Or at 655; *Gossett v. Simonson*, 243 Or 16, 21, 411 P2d 277 (1966). Nevertheless, sometimes an employee's conduct is so clearly outside the scope of employment that the question may be decided as a matter of law. *Stanfield*, 284 Or at 655.

Oregon courts have addressed infrequently the question whether an employee's sexual assault is conduct that so clearly exceeds the scope of employment that a claim for vicarious employer liability will fail as a matter of law.[4]

---

[4] Among other jurisdictions that have considered the question, the courts are virtually unanimous that an employee's sexual assault will not give rise to vicarious liability for churches, hospitals and other employers. *See, e.g., John R. v. Oakland Unified School Dist.*, 48 Cal 3d 438, 452, 769 P2d 948, 956-57 (1989) (school not vicariously liable for sexual molestation of student by a teacher); *Moses v. Diocese of Colorado*, 863 P2d 310, 331 (Colo 1993), *cert den* 511 US 1137 (1994) (jury's finding that priest's sexual conduct with parishioner was within the scope of his employment was erroneous as a matter of law); *Destefano v. Grabrian*, 763 P2d 275, 287 (Colo 1988) (sexual intercourse between priest and parishioner not part of priest's employment duties); *Doe v. Village of St. Joseph, Inc.*, 202 Ga App 614, 616, 415 SE2d 56, 57 (1992) (boarding school not vicariously liable for molestation of student by recreational supervisor); *Randi F. v. High Ridge YMCA*, 170 Ill App 3d 962, 965-66, 524 NE2d 966, 969 (1988) (sexual assault of child by a day care center's teacher's aide outside the scope of employment duties); *Hoover v. University of Chicago Hospitals*, 51 Ill App 3d 263, 267, 366 NE2d 925, 929 (1977) (sexual assault of hospital patient by doctor does not give rise to vicarious liability for the hospital); *Konkle v. Henson*, 672 NE2d 450, 456-57 (Ind App 1996) (sexual molestation by minister not authorized and thus not sufficient to establish vicarious liability); *H.R.B. v. J.L.G.*, 913 SW2d 92, 97 (Mo App 1995) (sexual abuse of child not within scope of priest's duties); *Birkner v. Salt Lake County*, 771 P2d 1053, 1058 (Utah 1989) (mental health facility not vicariously liable for sexual abuse of a patient by a therapist); *L.L.N. v. Clauder*, 203 Wis 2d 570, 552 NW2d 879, 888, *rev granted* 205 Wis 2d 133, 555 NW2d 814 (1996) (sexual relationship with parishioner outside the scope of priest's employment); *but see M.V. v. Gulf Ridge Council Boy Scouts*, 529 So 2d 1248, 1249 (Fla App 1988) (whether sexual molestation of Boy Scout by a first aid attendant at camp was in the scope of employment is an issue for a jury). Most of those jurisdictions apply the same sort of risk allocation theory of *respondeat superior* that controls in this state.

When the courts have addressed the question, the analysis unfortunately has been fairly summary.

In *G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 757 P2d 1347 (1988), the plaintiff sued a hospital for damages suffered from a sexual assault by one of the hospital's respiratory therapists. The trial court granted the hospital's motion to strike the plaintiff's claims based on *respondeat superior*, and the Supreme Court affirmed. The court began by describing the nature of the theory of vicarious liability. The court commented that the theory is based on

> "long-established policy reasons; *i.e.*, an employer who receives the social and economic benefits of employing others must also be responsible for the acts of employees who are only acting in this fashion because of their employment."

*Id.* at 57. Citing Prosser and Keeton, the court elaborated that the "modern justification" for the theory is "a rule of policy, a deliberate allocation of risk." *Id.* at 58 (quoting Keeton, *Prosser and Keeton on Torts* § 69 at 500). The court noted that with the shift to a risk allocation justification for vicarious liability, it was not plausible to reject employer liability for intentional employee torts merely because they were committed intentionally. It nevertheless decided to adhere to the basic limitation on vicarious liability that the tortious employee conduct, intentional or otherwise, must be "related to employment." *Id.* at 60-61. The court then reiterated the three requirements described in *Chesterman* and *Stanfield*. Turning to the allegations of the complaint, the court declared:

> "Where, as here, there is no allegation—and we cannot imagine one—that the employee was acting for the purpose of furthering any interest of the employer, plaintiff has failed to state a claim for tort liability and dismissal of plaintiff's claims * * * was proper."

*G.L.*, 306 Or at 61.

In *Dunn v. Gracia*, 95 Or App 150, 768 P2d 419, *rev den* 307 Or 719 (1989), we confronted the question whether vicarious liability could lie for sexual assault by an employee,

but we resolved the question as a matter of evidentiary sufficiency. The plaintiff, a former Boy Scout, alleged that he had been abused sexually by the wife of his volunteer scoutmaster—who also was a volunteer—and that, when the scoutmaster discovered the abuse, the scoutmaster admonished the plaintiff not to reveal it to others. The plaintiff sued the Boy Scouts and its local affiliate on a theory of *respondeat superior*. The trial court rejected the claim by way of summary judgment, holding that the defendants were not vicariously liable because there was no evidence that they controlled or had the right to control the scoutmaster or his wife. We affirmed, but on the ground that the summary record "conclusively shows" that the scoutmaster and his wife were not motivated by a purpose to serve the Boy Scouts. *Id.* at 153; *see also Carr v. US West Direct Co.*, 98 Or App 30, 36, 779 P2d 154, *rev den* 308 Or 608 (1989) (summary judgment dismissing vicarious liability claim based on employee sexual harassment and assault proper when evidence does not indicate that employee acted other than for personal reasons).

In *Erickson v. Christenson*, 99 Or App 104, 781 P2d 383 (1989), *appeal dismissed* 311 Or 266 (1991), we took an entirely different approach to the question. The plaintiff parishioner sued her pastor, Christenson, and the church that employed him, alleging that Christenson had manipulated her into having a sexual relationship with him, resulting in sexual abuse and emotional distress. The trial court dismissed the *respondeat superior* claims against the church for failure to state a claim. We reversed, holding, without further explanation, that:

> "Plaintiff has alleged that, in the exercise of his duties as a pastor, Christenson established a confidential relationship with [the plaintiff] and caused her harm by abusing that relationship. Confining our analysis to the four corners of the complaint, we conclude that it alleges that she sustained harm from acts performed within Christenson's scope of employment."

*Id.* at 109. In a footnote, we noted that the church argued that, as a matter of law, it could not be held liable for Christenson's conduct, because his seduction of the plaintiff was not motivated by a desire to serve the church and was not the kind of act that he was hired to perform. We responded:

"[T]he gravamen of plaintiff's complaint is not simply that Christenson seduced her but that he abused his position as her pastor to do so. Because the alleged wrongful act was improper performance of pastoral counseling duties, whether it occurred within the scope of employment is a factual issue."

*Id.* at 109 n 3.

The reasoning in *Erickson* was questioned in *Interstate Fire & Cas. v. Portland Archdiocese*, 747 F Supp 618 (D Or 1990), *reversed on other grounds* 35 F3d 1325 (9th Cir 1994). In that case, the federal district court, applying Oregon law, determined that the Archdiocese was not vicariously liable for sexual molestation committed by one if its priests, as a matter of law. The court noted *Erickson*, but commented:

"This court is not persuaded that *Erickson* controls this case. The successful claimant under the theory of *respondeat superior* must necessarily establish that the complained of acts occurred while the employee was acting within the scope of his/her employment. The Oregon Supreme Court recently stated three requirements necessary to conclude that an employee was acting within the scope of employment * * *. Application of these criteria to the facts in this case leads the court to conclude that the sexual molestation * * * was not motivated by a purpose to serve the employer, and was not of a kind which [the priest] was hired to perform * * *."

*Id.* at 623 n 4.[5]

Most recently, in *Finney v. Bransom*, 143 Or App 154, 924 P2d 319 (1996), *rev allowed* 324 Or 513 (1997), this court, sitting in banc, decided that sexual assault is outside the scope of a teacher's employment as a matter of law. The precise question before us was whether the plaintiff, acting

---

[5] *Erickson* was cited with approval in a law review article, in which the author argued for an extension of vicarious liability principles beyond traditional bounds to address the important social objective of protecting children from sexual abuse. Jessica Lynch, *A Matter of Trust: Institutional Employer Liability for Acts of Child Abuse by Employees*, 33 William & Mary L Rev 1295, 1314 (1992). The author recognized that "child beatings, rapes, and molestation could never meet any strict scope of employment test," but argued nevertheless for "alternative rationales" justifying the imposition of vicarious employer liability. *Id.* As an example of such an alternative rationale, the author cited *Erickson*.

on behalf of a daughter who had been sexually assaulted by a public school teacher, had provided statutory tort claims notice required of suits against public bodies and officials. ORS 30.275. The defendant teacher contended that the required notice was lacking, while the plaintiff held that it was not required, because the suit claimed damages for conduct that fell outside the scope of the teacher's employment. We agreed with the plaintiff, holding that "[s]exual conduct between a minor student and a teacher is not within the parameters of the responsibilities of a teacher as a matter of law." *Finney*, 143 Or App at 158; *see also Shoemaker v. Management Recruiters International*, 125 Or App 568, 575, 865 P2d 1331 (1993) (concluding, without explanation, that claim for vicarious employer liability for sexual assault of fellow employee by manager failed as a matter of law, because the assault was not of a kind that the manager was hired to perform).

From the foregoing case law, we draw the conclusion that we are not to determine as a matter of law that sexual abuse can *never* give rise to vicarious employer liability. The Supreme Court's *dictum* in *G.L.* certainly is suggestive of such a categorical proposition, but our subsequent cases have—with the notable exception of *Erickson*—consistently examined the allegations and evidence of each case in the light of the three requirements articulated in *Stanfield* and *Chesterman* and informed by the fundamental policies that support the doctrine of *respondeat superior*.

*Erickson* was, it must be acknowledged, decided differently. The underlying claims in that case were different in that they did not involve sexual assault, however, and the case is distinguishable on that basis. In a footnote, the *Erickson* opinion did state that, because the gravamen of the complaint was that the defendant had improperly performed his employment responsibilities, the complaint could not be dismissed as a matter of law. And the footnote reasonably could be read broadly to suggest that vicarious liability claims always will survive dismissal on the mere allegation of improper performance of employment responsibilities. We decline to read *Erickson* so broadly. Such a reading merely begs the question whether the tortious conduct was in fact part of the performance of the employee's job in the first place

and is not consistent with either prior or subsequent case law.

We turn then to an application of the three-part test of *Stanfield* and *Chesterman* to the allegations of plaintiff's complaint in this case in the light of the policy underpinnings of the doctrine of *respondeat superior* in general. So doing leads us to conclude that plaintiff has failed to state a claim. There simply are no allegations of fact that satisfy all three of the elements of vicarious liability. In particular, there are no facts from which it reasonably could be concluded that Swensen's sexual assaults were acts "of a kind [an] employee was hired to perform." *Stanfield*, 284 Or at 655. Plaintiff did allege, in conclusory terms, that Swenson's acts "were generally of a kind and nature which Swensen was required to perform as troop leader." But, without more, such a bald legal conclusion will not suffice. *See Whelan v. Albertson's, Inc.*, 129 Or App 501, 508, 879 P2d 888 (1994) (trial court properly dismissed vicarious liability claim "because plaintiff did not identify and sufficiently plead a connection between" the employee's tortious act and the acts that the employee was hired to perform).

Plaintiff insists that, while actual sexual assaults may not be a normal incident of scouting activities, many of Swensen's activities leading up to and facilitating the eventual assaults were a normal incident of his employment, and that suffices to establish vicarious liability. According to plaintiff, the befriending of plaintiff and his family described in detail in his complaint was

> "part and parcel of a classic case of pedophilic grooming wherein Swensen took advantage of his position under the Boy Scouts to commit the abuse."

Under *Erickson*, plaintiff argues, Swensen taking advantage of his position as Scout leader constituted the "improper performance" of his ordinary duties that we held in *Erickson* under similar facts to be sufficient to state a claim for vicarious liability. As we have already concluded, however, *Erickson* cannot properly be read to hold that simply phrasing a vicarious liability claim in terms of "improper performance" relieves a plaintiff of the need to satisfy all three requirements of *Stanfield* and *Chesterman*.

We conclude that plaintiff's complaint fails to state a claim against the Boy Scouts for vicarious liability arising out of the manipulations and acts of sexual abuse committed by Swensen. The trial court therefore did not err in dismissing that claim.

■ We turn to plaintiff's contention that the trial court erred in dismissing his negligence claim. Plaintiff argues that the trial court misread ORS 12.117 in concluding that the statute applies only to claims for intentional tortious conduct. According to plaintiff, the statute "is plainly intended to include claims of negligence, 'knowing' or otherwise," given that the extended limitation period is expressed as an exception to the limitation period that applies to negligence claims. The Boy Scouts contend that the trial court correctly concluded that the statute applies only to claims for intentional child abuse, as is clearly indicated by the addition of the element of "knowing" conduct in the statute itself. We conclude that both parties read too much into the statute. In brief, the statute clearly does apply to negligence claims, but only those involving "knowingly allowing, permitting or encouraging child abuse."

To resolve the parties' dispute on this issue requires us to ascertain the intended meaning of ORS 12.117, examining the text of the statute in context and, if necessary, its legislative history and other relevant aids to construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The text of the statute is, in relevant part, as follows:

"Notwithstanding ORS 12.110, 12.115 or 12.160, an action based on conduct that constitutes child abuse or conduct knowingly allowing, permitting or encouraging child abuse accruing while the person who is entitled to bring the action is under 18 years of age shall be commenced not more than six years after that person attains the age of 18 years of age, or if the injured person has not discovered the injury or the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the injury or the causal connection between the injury and the child abuse, not more than three years from the date the injured person discovers or in the exercise of reasonable care should have discovered the injury or the

causal connection between the child abuse and the injury, whichever period is longer."

ORS 12.117(1). Plaintiff in this case alleges that he did not discover the connection between his injury and his abuse until 1994, one year before the initiation of this action. Accordingly, the issue is whether the extended period of three years from the date plaintiff discovered or should have discovered the injury or the causal connection between the abuse and his injuries applies to this case.[6]

The statute says that "[e]xcept as provided in ORS 12.110, 12.115 or 12.160, an action based on conduct * * * knowingly allowing, permitting or encouraging child abuse" is subject to the extended provision. From that statutory language, we derive two insights. First, by its terms, the extended three-year-from-discovery limitation period is an exception to ORS 12.115, which is the statute of ultimate repose for negligence actions:

> "In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of."

ORS 12.115(1). Thus, it is readily apparent that the legislature intended the discovery period of ORS 12.117 to apply to at least some class of negligence claims; to conclude otherwise would require us to ignore the express reference to the statute of ultimate repose for negligence claims to which ORS 12.117 is to be an exception. We do not lightly turn a blind eye to relevant statutory language. ORS 174.010 (office of the judge is to ascertain the meaning of enacted language, "omitting nothing").[7]

---

[6] The Boy Scouts have argued, as an alternate ground for affirmance, that plaintiff's allegations also are insufficient in that they fail to allege facts from which a reasonable person could conclude that it was reasonable for him to have failed to discover his claim until 1994. Given our disposition of the matter on the principal grounds asserted by the parties, we do not address that alternative ground.

[7] The Supreme Court has resorted to "ignoring" statutory language in a very limited class of cases in which, because of imperfections in the statutory drafting, the court is impelled either to declare some language to have no effect or to read into the statute language that the legislature did not enact in order to make better sense of the language. In such cases, the court always opts the former course as the most consistent with the statutory command of ORS 174.010. *See, e.g., State v.*

Second, and by the same token, we note that the statute plainly refers to claims based on conduct *"knowingly* allowing, permitting or encouraging" child abuse. (Emphasis supplied.) Such language, as the Boy Scouts contend, is used to indicate a level of intent distinct from negligence. In the Criminal Code, for example, the legislature has drawn a distinction between intentional, knowing, reckless and criminally negligent conduct. *See* ORS 161.115(2); *State v. Cunningham*, 320 Or 47, 60, 880 P2d 431 (1994), *cert den* 514 US 1005, 115 S Ct 1317, 131 L Ed 2d 198 (1995) (identifying four levels of criminal intent); *State v. Boone*, 294 Or 630, 633, 661 P2d 917 (1983) (same).

Still, that is not always the case. Knowledge, both actual and constructive, also frequently is an element of a claim for negligence. For example, in product liability cases, a seller of a product is negligent if it knows or should have known of the dangerous propensities of its products. *Hoyt v. Vitek, Inc.*, 134 Or App 271, 288-89, 894 P2d 1225 (1995) (no evidence that defendant knew or should have known of hazards and, thus, no duty to warn). In slip-and-fall cases, similarly, an occupant of business premises may be held liable in negligence if the occupant knew that a foreign substance was on the floor and failed to use reasonable diligence to remove it. *See, e.g., Griffin v. K.E. McKay's Market of Coos Bay, Inc.*, 125 Or App 448, 451-52, 865 P2d 1320 (1993), *rev den* 319 Or 80 (1994) (affirming directed verdict for defendant in negligence case on ground that, among other things, there was "no evidence that, at any time before the fall, defendant's employees actually knew that ice or water had been spilled on the floor"). Closer to the point, cases for negligent hiring have been held to fail for lack of allegations or evidence that the employer knew or should have known that the employee would engage in sexually abusive conduct. *Shoemaker*, 125 Or App at 575.

---

*Webb*, 324 Or 380, 388, 927 P2d 79 (1996); *S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 617, 872 P2d 1 (1994). In this case, the parties have identified no such dilemma posed by the language of ORS 12.117, and we also find none.

Thus, the Boy Scouts' contention that the use of the word "knowingly" in the statute, by itself, manifests the legislature's intention that ORS 12.117 apply only to intentional conduct is without merit. Sometimes the word is used to connote a level of intent greater than negligence, and sometimes it is not. In this case, because of the legislature's explicit cross-reference to the statute of ultimate repose for negligence actions, we conclude that the legislature did not intend the term to be used in its more limited, intentional, sense. That is, in fact, the only reading of the statute that gives effect to all of its relevant language.[8]

---

[8] Although we find the intended meaning of the statute clear from its language, we note that the legislative history supports our analysis. The bill originated in the House, during the 1989 legislative session, at the request of the Oregon Trial Lawyers Association (OTLA). As originally proposed, the bill was not limited to actions for child abuse. Several members of the House subcommittee to which the bill was assigned expressed concern that the bill would open the courtroom doors to "your average run of the mill negligence case" but also expressed appreciation for the need for a special extension for child abuse cases. Tape recording, House Committee on Judiciary, Civil Law Subcommittee, March 20, 1989, Tape 49, Side B at 1458 (comments of Representatives Clark, Mannix and Minnis). The bill then was amended to create a new statute of limitations relating solely to an "action based on conduct that constitutes child abuse," Amendment, House Committee on Judiciary, Civil Law Subcommittee, HB 2668, April 5, 1989, Ex I, and, in that form, the bill was passed out of subcommittee, full committee and the floor of the House.

In the Senate Judiciary Committee, the issue arose concerning whether the bill would apply to claims against institutions, such as churches and the Boy Scouts, for abuse by their employees. Mark Williams, an attorney, testified that, although the statute might apply to claims of vicarious liability against such institutions, as a matter of *substantive* law, such claims are likely to fail, because "[n]o one hires [employees] to sexually abuse children. And [in] the case law, it is very clear that these people are not going to be liable on that basis." Tape recording, Senate Judiciary Committee, May 24, 1989, Tape 197, Side A at 411. Williams suggested that such institutions, however, could be found liable for negligent supervision, and that the bill should be amended to apply to such claims as well:

"The case law is, however, also supportive of a cause of action based on negligent supervision by an institution of its employees, negligence in hiring. In looking at the record of an individual, if, for instance, a pastor is diagnosed as a pedophile or as having problems with sexually abusive behavior somewhere in his education or training, or is put in a position in a church and a problem arises, report is made to the church authorities. The church authorities take action and, if the action is inappropriate and results in this pastor being put in another church where he can go ahead and sexually abuse more victims, then we believe that the liability of the institution for making those kinds of decisions should be something that we can pursue."

*Id.* Williams explained that, although the existing language of the bill, which at that point referred only to claims "based on conduct that constitutes child abuse," arguably applied to negligent supervision claims, he would prefer to have language in the statute expressly applying to such claims:

Arriving at that conclusion, however, does not end the matter before us. As we have noted, the term "knowledge" can be used to implicate both actual and constructive knowledge. That is particularly so in the negligence context, in which, depending upon the nature of the particular claim, actual or constructive knowledge may be required as an element. In slip-and-fall cases, for example, actual and constructive knowledge represent two distinct theories of liability. *Griffin*, 125 Or App at 451. From the language of ORS 12.117 and similar statutes, however, we find evidence that the legislature knows the difference between the two types of knowledge and uses appropriate language to distinguish between them. In ORS 12.117, the legislature described the level of knowledge of the nature of the claim that triggers the discovery statute in actual and constructive terms: "three years from the date the injured person discovers or in the exercise of reasonable care should have discovered" the

---

"[W]e would choose to have language which would make an action based on child abuse, but not only based on the actual act of child abuse, but on conduct which allows or permits or encourages child abuse. Now that's a broadening of this—of the language that you see before you, but I think that it's fairly within the scope of this provision and, really, better addresses the concerns you've heard raised today."

*Id.* at Tape 197, Side A at 411, and Tape 198, Side A at 038. Two days later, an amendment containing the additional language "or conduct allowing, permitting or encouraging child abuse" was presented to the committee and was debated. Amendment, Senate Judiciary Committee, HB 2668, May 26, 1989, Ex N. Senator Shoemaker expressed concern about the potential effect of the proposed amendment on collateral defendants who, although perhaps negligent, were not knowingly involved in the abuse. The committee adjourned before those concerns could be addressed. Tape recording, Senate Judiciary Committee, May 26, 1989, Tape 202, Side A at 365. At the following hearing, an OTLA representative proposed the addition of the word "knowingly" before the phrase "allowing, permitting or encouraging." Tape recording, Senate Judiciary Committee, May 30, 1989, Tape 208, Side B at 303. Committee counsel explained that "in the case of a cause of action of a negligent hiring of someone, * * * inserting the word * * * 'knowing' would raise the standard somewhat." *Id.* Shoemaker expressed satisfaction with the amendment, and, without further discussion, the bill was amended and passed out of committee as amended. The House ultimately approved the bill in its amended form without further relevant discussion.

We find in the foregoing discussion no evidence that the legislature intended the phrase "knowingly allow, permit or encourage" to be limited to claims for intentional conduct. If the legislative history proves anything, it is that the language was designed precisely to encompass negligent hiring, retention and supervision claims against churches, the Boy Scouts and similar institutions whose employees abuse children. The addition of the qualifier "knowingly" was merely intended to limit the scope of such claims to those in which the employers have actual knowledge of the employee's abusive conduct.

injury or the causal connection between the injury and the abuse. Similarly, in ORS 12.110(4) and (5)(a), the general tort limitation statute, the legislature uses the same "discovered or in the exercise of reasonable care should have discovered" language. *See also* ORS 12.135(2) (same); ORS 12.137(1)(a) (same); ORS 12.274 (same); ORS 12.276(1) (same); ORS 12.280 (same). In contrast, the legislature used no such "or in the exercise of reasonable care should have" known or discovered language in reference to the conduct that may form the basis of a claim subject to the extended limitation period contained in ORS 12.117. Instead, the legislature said simply that the statute applies to claims based on conduct "*knowingly* allowing, permitting or encouraging" child abuse. We conclude that the conduct described in the statute is actual, as opposed to constructive, knowing conduct.

■   With the foregoing construction of the statutory language, then, we turn to the allegations of plaintiff's complaint. Examining the allegations of the complaint liberally, giving plaintiff every favorable inference, we find no allegations of fact that would allow a factfinder reasonably to conclude that the Boy Scouts had actual knowledge of Swensen's manipulations and abuse. The closest allegation to the point is contained in paragraph 18, in which plaintiff asserts that

> "[t]he negligence of the Boy Scouts and Cascade Pacific Council as set out in paragraph 14 above constitutes 'conduct knowingly allowing or permitting child abuse' within the meaning of ORS 12.117."

That allegation contains no allegations of fact at all. It simply concludes that the allegations of fact contained in a separate paragraph satisfy the requirements of a statute as a matter of law, nothing more. The cross-referenced paragraph contains allegations of fact, but none regarding the actual knowledge of the Boy Scouts that Swensen was abusing children in his care. In that paragraph, plaintiff alleges only that the Boy Scouts were negligent in failing to screen persons such as Swensen who "might" be a "risk" to children. There is no allegation that the Boy Scouts knew that Swensen was such a risk to children, much less that they knew that he actually was abusing children. We conclude that the complaint lacks any allegation of fact from which it reasonably could be

inferred that the Boy Scouts "knowingly allowed, permitted or encouraged child abuse" as that phrase is used in ORS 12.117. Accordingly, plaintiff's claims for negligence against the Boy Scouts are not subject to the extended limitation period of that statute, and the trial court did not err in dismissing them on the grounds that the claims had been untimely filed.

Affirmed.